UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CARRIE A. MARSHALL,

Plaintiff,

v.

NANCY A. BERRYHILL,

Defendant.

Case No. 19-cv-00306-WHO

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 18, 23

The parties have filed cross-motions for summary judgment in this Social Security appeal. Based upon my review of the parties' papers and the administrative record, I GRANT plaintiff Carrie A. Marshall's motion, DENY the Commissioner of Social Security's motion, and remand for further proceedings consistent with this Order.

## BACKGROUND

### I. PROCEDURAL HISTORY

Marshall filed a Title XVI application for supplemental security benefits and a Title II application for disability benefits. Administrative Record (AR) 70, 71. Her claims were denied initially and on reconsideration. AR 114, 132. Marshall requested a hearing before an Administrative Law Judge ("ALJ") on April 25, 2016. AR 149. That hearing was held on August 4, 2017, before ALJ David LaBarre. AR 38.

At the hearing, Marshall and Timothy Farrell, a vocational expert, testified. AR 38. On January 10, 2018, the ALJ issued a decision finding that Marshall was not disabled. AR 30. After making a timely appeal, the Appeals Council denied Marshall's request for review on November 15, 2018. AR 1. Marshall then timely filed this civil action.

### II. WORK AND MEDICAL HISTORY

Marshall claims that she is disabled due to cardiomyopathy, panic attacks, posttraumatic stress disorder ("PTSD"), depression (moderate to major depression), and anxiety. AR 72, 85, 100, 118. The alleged onset date of Marshall's disabilities is June 26, 2015. AR 73, 86, 101, 119. Before she alleges that she became disabled, she was employed as a waitress and floor manager at

a restaurant. AR 57. As a floor manager, Marshall fired restaurant workers, had disciplinary responsibilities, and dealt with unruly customers. AR 57. On Marshall's last day of work in July 2015, a customer threatened her life and, due to that stress, Marshall left the restaurant. AR 42-43. Marshall was then fired for walking out of her job. AR 255. Marshall believes that she lost her job because her managers were no longer able to handle her moods. *Id.*

### A. Treating Medical Provider Records

#### 1. Mental Impairments

Marshall testified that she had experienced numerous traumatic events throughout her life. She was raped at 15 years old. AR 46. She watched her father "pass away." AR 49. She was involved in a serious car accident in 2008. AR 261. She testified that as "things go on throughout the day there will be sounds or songs or smells that bring back when I was 15 [years old] what happened to me." AR 48. Smells, sounds (like car sounds), people's faces, any "friction," yelling, or loud talking can trigger her PTSD. AR 46. She suffers from severe panic attacks and "very bad anxiety." AR 46, 249. She fears her implanted defibrillator "is going to go off" and it makes her feel like she is going to die every day. AR 46.

To treat her mental health impairments, Marshall visited Nurse Practitioner (NP) Elizabeth Mole at Pathways to Wellness.[1] Marshall started seeing NP Mole in 2014 and continued to see Mole monthly through July 3, 2017. AR 413, 493. NP Mole's treatment notes document treatment for Marshall's diagnosed depression, anxiety, and PTSD. NP Mole's treatment notes also document the symptoms of Marshall's mental impairments, such as mood swings, anxiety, crying spells, concentration levels, and verbal altercations. During visits with NP Mole, Marshall repeatedly characterized her mood as "very anxious" and admitted to having "mood swings." AR 396 (July 23, 2015), 400 (August 20, 2015), 429 (January 18, 2016), 434 (March 3, 2016). Marshall reported to NP Mole feeling "increased anxiety." AR 396 (July 23, 2015), 400 (August

---

[1]The ALJ referred to NP Mole as a "psychiatrist" and "Dr. Mole." AR 23. This is incorrect. Mole was a nurse practitioner when she treated Marshall. AR 396-407, 496, 502-509 (electronically signing treatment notes as "Elizabeth Mole, NP"), 416 (signing Medical Source Statement dated January 18, 2016, as "Elizabeth Mole, MSN, RN, PMHNP"); AR 552 (signing Medical Source Statement dated July 24, 2017, as "Elizabeth Mole, MSN, RN, PMHNP").

20, 2015). Marshall also suffered from "crying spells." AR 396 (July 23, 2015), 400 (August 20, 2015), 429 (January 18, 2016), 434 (March 3, 2016). NP Mole's treatment notes indicate that Marshall had "fair" or "low" concentration levels during their monthly visits. AR 396 (July 23, 2015), 401 (August 20, 2015); 405 (September 17, 2015), 425 (November 30, 2015), 430 (January 18, 2016). During a monthly visit with NP Mole on January 18, 2016, Marshall "admit[ted] to increased verbal altercation with [her] mother and her partner." AR 430.

NP Mole's treatment notes also documented that Marshall's medications were not always effective, at controlling at least Marshall's nightmares, insomnia, "flashbacks," and other symptoms that impacted her sleep.[2] Under the "History of Present Illness/Interval History" section of her July 2015 notes, NP Mole wrote, "[s]leep is about 4-5 hours, not controlled with medications." AR 396, 400, 404 (noting the same on August 20, 2015, and September 17, 2015); *but see* AR 425 (November 30, 2015, notes that Marshall's "sleep is about 5-6 hours" and that it is "slowly resolving with medications").

NP Mole's treatment notes also describe Marshall's hallucinations. In her notes dated January 30, 2017, NP Mole stated, "ongoing AH [auditory hallucinations] and racing thoughts. AR 506. Under the "Impression" section of her notes, NP Mole wrote, "ongoing anxiety and depression and AH – increase Viibryd to possibly treat sx [symptoms]." AR 508. Other providers also noted reports of auditory hallucinations. For example, on May 31, 2017, Marshall met with NP Joan Fraino at Pathways to Wellness. AR 497. In her notes from that visit, NP Fraino wrote, Marshall "[c]ontinues to have AH/VH [auditory hallucinations/visual hallucinations] that are intrusive. Medication effective at lowering the tone of the voices. Voices are non-commanding." *Id.* Under the "Impression" section of her notes, NP Fraino wrote, Marshall "[c]ontinues to have AH/VH." AR 500. NP Mole's July 3, 2017, treatment notes state that Marshall had "[o]ngoing auditory hallucinations." *Id.* AR 493. Under the "Impressions" section, NP Mole wrote,

---

[2] Under the "review of systems" section of Mole's treatment notes, Marshall "reported feeling depressed, difficulty concentrating, anxiety, insomnia, excessive moodiness, stress, and nightmares but no other psychiatric issues." AR 397, 401, 405. "Sleep disturbance" is also a symptom listed in the Mole's 2016 Medical Source Statement, AR 413, and the 2017 Medical Source Statement lists insomnia as a symptom. AR 551.

"[i]ncreased AH – increased anxiety."  AR 495.

NP Mole signed two Medical Source Statements containing her opinions regarding the impacts Marshall's symptoms have on her ability to function.  In her January 18, 2016 Medical Source Statement ("2016 Statement"), NP Mole identified that Marshall had major depressive disorder and PTSD.  *Id.*  When identifying the psychological conditions and symptoms that affect Marshall, NP Mole identified "[p]roblems interacting with public" and that "[d]ue to intermittent panic attacks and a high risk of exacerbation of her symptoms, it is recommended that [Marshall] not be around people a lot."  *Id.*  When describing how Marshall's conditions and symptoms impact her ability to perform work, NP Mole opined Marshall was moderately limited in her ability to sustain concentration and persistence, due to her "marked inability due to moderate anxiety." [3]  *Id.*  She opined regarding "social interaction" that Marshall had a "moderate" ability to "interact appropriately with the general public" and "accept instructions and to respond appropriately to criticism from supervisors," based on Marshall's "marked social fear."  AR 415. When describing the treatment she provided to Marshall, NP Mole wrote, "pharmacological treatment," but noted that Marshall's response to the medications was "minimal."  AR 413.  Due to Marshall's impairments, NP Mole opined Marshall will be absent from work more than four days per month.  *Id.*

In a Medical Source Statement dated July 24, 2017 ("2017 Statement"), NP Mole identified that Marshall had "Major Depressive Disorder, recurrent, with psychotic features" and PTSD.  AR 551.  NP Mole opined that Marshall had an "increase in anxiety, irritability, depressive symptoms, [and] insomnia."  *Id.* When listing Marshall's symptoms and findings on mental status examination, NP Mole wrote, "Carrie displays low energy, depressed mood, poor concentration, auditory hallucinations, flashbacks, [and] nightmares."  *Id.*  Marshall's "symptoms typically occur in work settings, as well as community and home settings.  These symptoms lead to considerable social, occupational, and interpersonal dysfunction."  AR 551.  There was no

---

[3] "Moderate" means "[a]ble to perform designated work-related mental functions, but will have limitations that impair the effective performance of the task **incrementally for a total between 11% to 20%** of an 8-hour workday or 40 hour workweek."  AR 414 (emphasis in original).

4

mention of auditory hallucinations in her January 2016 statement, but in her July 2017 Statement, NP Mole noted that Marshall had been experiencing auditory hallucinations. AR 551, 552.

### 2. Physical Impairments

Marshall claims that her heart conditions – history of syncope, cardiomyopathy, and atherosclerotic heart disease – cause symptoms that prevent her from working. AR 43. She claims to get heart palpitations when nervous. *Id.* Marshall uses an implanted defibrillator but is fearful it will "go off." AR 46. She testified that her heart conditions have cause her to faint six times and she has been hospitalized for those conditions once. AR 44. Marshall also suffers from vertigo and related spells of dizziness and near fainting. AR 43, 50-52.

Romesh K. Japra, M.D., was Marshall's treating cardiac physician. Marshall first visited Dr. Japra on December 10, 2013. AR 546. Marshall saw Dr. Japra on a "monthly or PRN" basis. *Id.* Dr. Japra took notes for each visit, and the most recent treatment note is dated June 29, 2017. AR 514.

In his treatment notes, Dr. Japra diagnosed Marshall with congestive heart failure ("CHF") and documented that Marshall uses an implanted defibrillator. AR 326, 327, 328, 334, 336, 338, 473. Under the "complaints" section of his notes, Dr. Japra recorded the symptoms of Marshall's physical impairments including, chest pressure, shortness of breath, an episode of syncope, and dizziness. Marshall told Dr. Japra she felt chest pressure during her October 2015 visits. AR 475, 474 (October 26, 2015). Marshall reported feeling a "shortness of breath" on numerous visits from 2015 to 2017. AR 473 (March 3, 2016), 520 (August 29, 2016), 518 (February 24, 2017), 517 (March 15, 2017), 516 (April 17, 2017), 514 (June 6, 2017). Marshall told Dr. Japra she had an "episode of syncope" on June 29, 2016. AR 521.

Dr. Japra's treatment notes also documented Marshall's leg condition, which caused numbness and was diagnosed as edema. AR 475 (October 2015, complaints of "numbness in the extremities"), 520 (August 29, 2016, complaints of "bilateral leg cramping"); 519 (October 12, 2016, "numbness and tingling sensation in the extremities"), 518 (February 24, 2017, "still [complains of] numbness and tingling sensation in the [upper extremities] and [lower extremities]"), 514 (June 29, 2017, "edema in the [lower extremities]").

5

Dr. Japra submitted a Cardiac Medical Source Statement dated July 19, 2017 ("Cardiac Statement"). AR 546-549. In the Cardiac Statement, Dr. Japra diagnosed Marshall with "Congestive Heart Failure, Atherosclerotic Heart Disease with Angina, Cardiomyopathy, [and] [a history of] Syncope." AR 546. To "describe the frequency, nature, location, radiation, precipitating factors, and severity" of Marshall's anginal pain, Dr. Japra wrote, "[chest pain] on [and] off. Worse on exertion [and] under stress." *Id.* When asked "[w]hat is the role of stress in bringing on your patient's symptoms," Dr. Japra answered, "symptoms get worse under stress and under exertion." AR 547. When asked to "[i]dentify the clinical findings, laboratory and test results that show your patient's medical impairments," Dr. Japra wrote, "SOB [shortness of breath] on exertion, Edema in both LE [lower extremities] . . . ." AR 546. Dr. Japra responded "yes" when asked if Marshalls legs should be "elevated with prolonged sitting." AR 548. And that her legs should be "elevate[d] [at] 30° to 45°." *Id.* During an eight-hour working day, Marshall's legs should be elevated for "about 3 [to] 4 hours." *Id.*

**B.  Examining Psychologist Opinion**

Marshall visited Ute Kollath, Ph.D. on November 6, 2015, at the Bay View Medical Clinic for a "Mental Status Evaluation." AR 409. Dr. Kollath submitted a report of her visit. *Id.* The report documents Marshall's complaints that her medications were ineffective as well as Marshall's challenges interacting with other people. Under the "presenting problem" section, Dr. Kollath wrote, Marshall "does not consider psychotropic medication intake as effective." *Id.* Under the "past psychiatric history" section, Dr. Kollath noted Marshall's "[r]esponse to medications" was "poor." AR 410. Dr. Kollath wrote that "she has poor frustration threshold with angry outbursts, and that Marshall "finds that she over reacts [sic] to minor stressors." AR 409. She also "can't deal with people." AR 409. Dr. Kollath opined that Marshall had a "moderately impaired" ability to "withstand the stress of a routine workday;" "interact appropriately with co-workers, supervisors, and the public on a regular basis;" and "adapt to changes, hazards, or stressors in [a] workplace setting . . . ." AR 412.

**C.  Consulting Opinions**

The State agency medical consultants who reviewed Marshall's records noted Marshall's

"social interaction limitations." AR 82, 95, 112, 130. State agency medical consultant Norman Zukowsky, PhD, conducted a mental residual functional capacity assessment dated December 3, 2015. AR 82, 95. Dr. Zukowsky opined that Marshall "can accept non-confrontational supervision and get along adequately with co-workers and the public in brief or casual interactions." *Id.* He also noted that "[f]requent, extensive or prolonged interactions with the public are precluded." *Id.* State agency medical consultant Anna M. Franco, Psy. D., conducted a mental residual functional capacity assessments dated March 21, 2016. AR 112, 130. She drew the same conclusions.

### D. Marshall's Testimony and Self-Function Report

At the hearing on August 4, 2017, Marshall described the symptoms of her mental and physical impairments and the ineffectiveness of her medications. She testified that on some days, "I feel completely weak and inadequate like I'm not in my body." AR 49. Marshall stated that she takes medications "to calm my anxiety and nervousness down," but the medications "rarely" help. *Id.* The medications only help her enough "to deal with inside household things" and her children. *Id.* She believes the medications cannot get her symptoms "down to where I'm functionable outside." *Id.*

Marshall submitted a Function Report dated September 23, 2015. AR 257. In her report, Marshall discussed her struggles in work and social settings. When asked how her illnesses or conditions limit her ability to work, Marshall wrote, "my disabilities cause me to be unable to be around groups[,] loud sounds affect me . . . . it caused me to lose my job, finally my work could no longer handle me." AR 249. Marshall believes that she was "fired for walking out [of her job] when customers threatened me" and her "managers [were] not able to handle [her] moods." AR 255. Due to her disabilities, Marshall asserts that she could not "be in public, take authority, [and] handle my panic attacks." AR 250. When asked if she has problems getting along with others, Marshall responded that it is "hard to deal with others[,] especially when they threaten my kids or me." AR 254.

### E. Barbara Marshall's Third-Party Function Report

Marshall's mother, Barbara Marshall, submitted a third-party function report dated October

2, 2015.  AR 261-268.  Marshall and her mother spend every day together.  AR 261.  Barbara helps Marshall with her children.  *Id*.  Barbara explained that Marshall has "become very nervous and scared to go outside at times."  *Id.*

Barbara stated that due to Marshall's disability, she cannot "be around people and enjoy life."  AR 262.  Marshall "just does not want to participate all the time in" social activities.  AR 266.  Barbara noted that Marshall "feels others don't understand her so it causes her not to be able to get along with strangers."  *Id.*  Barbara gives Marshall daily reminders to take her medications.  AR 263.  She observed that Marshall "takes [medications] and they haven't worked."  AR 268.

## III.    ALJ'S DETERMINATION

The ALJ applied the five-step sequential evaluation process to determine Marshall's disability claim.  AR 18.  At Step One, the ALJ determined that Marshall had not engaged in substantial gainful activity since the alleged June 26, 2015, onset date.  AR 19.  At Step Two, the ALJ determined that Marshall has severe impairments of: cardiomyopathy, affective disorder, anxiety disorder, PTSD, and vertigo.  *Id.*

At Step Three, the ALJ determined that Marshall does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, subpart P, Appendix 1.  AR 20.  For the alleged mental health impairments, the ALJ analyzed the "paragraph B" and "paragraph C" criteria.  AR 20-21.[4]

The ALJ decided that none of the "paragraph B" criteria were satisfied because Marshall's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation.  AR 21.  The ALJ concluded that Marshall had no limitations in understanding, remembering, and

---

[4]  To satisfy the paragraph B criteria, Marshall had to demonstrate at least two of the following: "1. Marked restriction in activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence or pace; or 4. Repeated episodes of decompensation, each of extended duration[.]" 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00.A, § 12.04.B.  For paragraph C, she must have had the chronic affective or disorder for at least two years and: (1) repeated episodes of decompensation, each of extended duration; (2) a change in mental demands/environment would cause decompensation; or (3) history of a year or more of inability to function outside highly structured living arrangement that needs to be continued. *Id*. at § 12.04.C. Repeated episodes of extended duration means "three episodes within 1 year, or an average of once every four months, each lasting for at least 2 weeks." *Id*. § 12.00.C.4.

applying information.  AR 20.  The ALJ found that Marshall had a moderate limitation in interacting with others, as the evidence suggested that Marshall has "moderate limitations in social functioning in situations that involve high pressure or confrontation." *Id.*  In reaching this determination, the ALJ noted in particular Marshall's statements that she "cannot be around groups," that she "was fired from her job when she walked out after being threatened by a customer," and "she does not spend time with others." *Id.*

Regarding concentrating, persisting, or maintaining pace, the ALJ concluded Marshall had a moderate limitation, noting that while Marshall claims that she can sometimes pay attention but becomes confused easily, will give up on following instructions, and does not handle stress well, only a moderate limitation was supported because the "record consistently documents unremarkable concentration." AR 21.  For adapting or managing oneself, the ALJ determined that Marshall had only a mild limitation: although she testified that her mother occasionally helps Marshall get dressed when she cannot dress herself and feels "completely weak physically and mentally every day," her function report indicated that she gets her children ready for school, tends to her daughter throughout the day, does household chores, and can drive. *Id.*

The ALJ found none of the "paragraph C" criteria satisfied.  There was insufficient evidence that Marshall required a highly intensive level of support or a highly structured setting that diminished the symptoms of her mental disorders and insufficient evidence that Marshall "has minimal capacity to adapt to changes in the environment or to demands that are not already part of daily life." *Id.*

Prior to Step Four, the ALJ determined that Marshall retained the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR § 404.1567(a) and § 416.967(a) with the following limitations:

> the individual is able to frequently lift and carry less than ten pounds; is occasionally able to lift ten pounds; sit for up to six hours; stand and walk for two hours in an eight-hour workday with normal breaks; should never climb ladders, ropes or scaffolds; can occasionally climb ramps/stairs; can occasionally stoop, kneel, crouch and crawl; can occasionally balance; must avoid concentrated exposure to unprotected heights, open flames, and dangerous moving machinery; can understand, remember and carry out simple and routine instructions; and can tolerate occasional demanding work pressures such as high volume output, very

9

short deadlines, or high levels of precision.

AR 21-22.

In setting the RFC, the ALJ first determined that Marshall's medically determinable impairments could reasonably be expected to cause her alleged symptoms. AR 23. The ALJ then discounted Marshall's allegations regarding the intensity, persistence, and limiting effects of her symptoms as they were "not entirely consistent with the medical evidence and other evidence in the record." *Id.* Addressing the physical impairments first, while the ALJ recognized that Marshall uses an implanted defibrillator and has been diagnosed with of a history of syncope, cardiomyopathy, and atherosclerotic heart disease with angina – and that she had complained of dizziness, shortness of breath, and chest pain "on and off" in 2015 through 2017 – the ALJ found more significant that Marshall did not receive "a significant amount of treatment" in 2016 and reported that she felt her symptoms were "fairly controlled" in 2017. *Id.* The ALJ noted that throughout this time the diagnostic imaging, other studies, and physical examinations were "relatively unremarkable" or "normal." AR 23, 25.

The ALJ concluded that Dr. Japra's opinions of Marshall's limitations – that Marshall could walk only one or two blocks, can only sit, stand, walk two hours each per day but must be able to change position at will, can never perform all postural activities, would need unscheduled breaks of 15 to 30 minutes one to two hours, and would need to elevate her legs between three to four hours a day – as not supported by the objective evidence as a whole. AR 25. In doing so, the ALJ focused on the "unremarkable" testing and examinations in addition to the lack of evidence that Marshall had to elevate her legs during the day. *Id.* The ALJ asserted that Japra's opinion on limitations reflected Marshall's "subjective complaints rather than his own objective observations" and found that Japra's opinions were further undermined because he indicated that these limitations had been present starting in 2013, yet Marshall worked until 2015. *Id.*

The ALJ then assigned partial weight to the State agency medical consultant at initial review that Marshall could perform light work. AR 26. Only partial weight was given because the "assessment does not fully account for the extent of the claimant's heart impairment and vertigo" that would limit her to light work, with the additional limitation of only two hours of

standing and walking.  AR 26.  The State agency medical consultant's opinion, at reconsideration, that Marshall could perform light work with limitations, received "slightly more weight than the consultant at initial review," because "the assessment of occasional postural limitations and avoidance of workplace hazards is more consistent with the evidence in its entirety."  *Id.*

Addressing Marshall's mental impairments, the ALJ gave Dr. Kollath's opinion partial weight because the assessment of moderate limitations in concentration, persistence and pace, and social functioning were consistent with Marshall's PTSD and anxiety.  *Id.*  As a result, the ALJ limited Marshall to remembering and carrying out simple and routine instructions and only occasional demanding work pressures.  *Id.*

The ALJ gave "less weight" to NP Mole's assessments assigning moderate limitations to all areas of functioning and opining that Marshall would miss more than four days of work each month.  AR 26.  The opinion regarding missed work, according to the ALJ, was not supported by Mole's identification of Marshall's mood as sad and depressed and with a flat and blunted affect.  The ALJ found Mole's opinions as to only moderate limitations in concentration, persistence and pace and social functioning were "better supported" and accommodated by the ALJ's RFC.  *Id.*

The ALJ also gave only "some weight" to Mole's 2017 Statement that likewise indicated that Marshall would miss more than four days of work per month.  While Mole identified various, significant symptoms reported by Marshall (low energy, depressed mood, trouble concentrating, auditory hallucinations), the ALJ rejected the missing work limitation because Mole's "examination findings" were mostly "benign" and there was no "objective evidence of hallucinations."  AR 27.

With respect to the State agency psychological and psychiatric consultants' opinions – finding only moderate limitations and that Marshall could perform unskilled tasks, accept supervision, and get along adequately with others in brief encounters – the ALJ assigned great weight.  *Id.*

The ALJ discounted the testimony of Marshall's mother Barbara.  Because Barbara was not medically trained, her testimony concerning the degree or frequency of "medical signs and symptoms" were questionable, and the limitations she and Marshall described were "simply not

11

consistent" with the "preponderance of the opinions and observations by medical doctors in this case." AR 27.

The ALJ concluded that Marshall is unable to perform any past relevant work because she is now limited to "sedentary work." Then, at Step Five, the ALJ found that based on Marshall's age, education, work experience, and RFC, she could perform the "representative occupations" of a small parts assembler, hand sander, and check weigher. AR 29, 38.

## LEGAL STANDARD

### I. DISABILITY DETERMINATION

A claimant is "disabled" as defined by the Social Security Act if she is (1) "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the impairment is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 1382c(a)(3)(A)-(B); *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012). To determine whether a claimant is disabled, an ALJ engages in a five-step sequential analysis as required under 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the first two steps of the evaluation, the claimant must establish that she (1) is not performing substantial gainful activity, and (2) is under a "severe" impairment. *Id.* § 416.920(a)(4)(i)-(ii). An impairment must have lasted or be expected to last 12 months in order to be considered severe. *Id.* § 416.909. In the third step, the claimant must establish that her impairment meets or medically equals a listed impairment described in the administrative regulations. *Id.* § 416.920(a)(4)(iii). If the claimant's impairment does not meet or equal one of the listed impairments, before proceeding to the fourth step, the ALJ is to make a residual functional capacity determination based on all the evidence in the record; this determination is used to evaluate the claimant's work capacity for steps four and five. *Id.* § 416.920(e). In step four, the claimant must establish that her impairment prevents the claimant from performing relevant work she did in the past. *Id.* § 416.920(a)(4)(iv). The claimant bears the burden to prove

steps one through four, as "at all times, the burden is on the claimant to establish [his] entitlement to disability insurance benefits." *Id*. (alterations in original). Once the claimant has established this prima facie case, the burden shifts to the Commissioner to show at the fifth step that the claimant is able to do other work, and that there are a significant number of jobs in the national economy that the claimant can do. *Id*. §§ 416.920(a)(4)(v),(g); 416.960(c).

## II.  LEGAL STANDARD

Under 42 U.S.C. § 405(g), the court reviews the ALJ's decision to determine whether the ALJ's findings are supported by substantial evidence and free of legal error. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *DeLorme v. Sullivan*, 324 F.2d 841, 846 (9th Cr. 1991) (ALJ's disability determination must be supported by substantial evidence and based on the proper legal standards). Substantial evidence means "'more than a mere scintilla,' but less than a preponderance." *Saelee v. Chater*, 94 F.3d 520, 521- 522 (9th Cir. 1996) quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (internal quotation marks and citation omitted).

The court must review the record as a whole and consider adverse as well as supporting evidence. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). Where evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Robbins*, 466 F.3d at 882 (quoting *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)); *see also Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).

### DISCUSSION

Marshall claims the ALJ erred by: (i) improperly rejecting the medical evidence from Dr. Kollath, NP Mole, and Dr. Japra; (ii) improperly rejecting Marshall's testimony; (iii) improperly rejecting her mother's statements; and (iv) failing to support the Step Five decision with substantial evidence. The Commissioner opposes and moves for summary judgment, arguing that the ALJ's decision was adequately supported by substantial evidence.

United States District Court
Northern District of California

## I.    THE MEDICAL OPINION EVIDENCE

The Ninth Circuit distinguishes between three types of physicians that provide information about a claimant: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non examining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, the opinion of a treating physician is entitled to greater weight than the opinion of a non-treating physician.  *Id.*; 20 C.F.R. § 404.1527(d)(2).  However, a treating physician's opinion "is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability."  *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (citation omitted).  In order to properly reject the opinion of a treating or examining doctor when it is uncontradicted by another doctor, the ALJ must state "clear and convincing reasons" for doing so. *Lester*, 81 F.3d at 830.  If the treating or examining physician's opinion is contradicted by another physician, however, an ALJ may reject the treating or examining physician's opinion if she states "specific and legitimate reasons" that are supported by substantial evidence.  *Id.* at 830 - 831.

If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the SSA considers specified factors in determining the weight it will be given.  Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician and the "nature and extent of the treatment relationship" between the patient and the treating physician.  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

### A.    Examining Psychologist Dr. Ute Kollath

While the ALJ gave "partial weight" to Dr. Kollath's opinions that Marshall was moderately limited in her ability to withstand the stress of a normal workday and interact appropriately with others – consistent with Marshall's PTSD and anxiety – Marshall argues that the ALJ erred by attempting to "accommodate" those limitations in the RFC by restricting Marshall to jobs with only occasional "demanding work pressures "such as high volume output, very short deadlines, or high levels of precision."  AR 26.  Marshall argues that those purported restrictions do not actually address that Kollath, NP Mole, and the agency consultants all opined

that Marshall would have moderate difficulty in interacting with supervisors, coworkers, or the public. Marshall points out that nowhere did the ALJ address her documented history of frequent angry outbursts and overreaction to minor stressors, which is what the medical opinions noted. She complains that nothing in the ALJ's opinion, or restrictions from high volume or short deadline jobs, actually addresses these limitations.

The Commissioner responds that substantial evidence supports the ALJ's determination that the RFC accommodated Dr. Kollath's opinion that Marshall was moderately limited in her interactions with the public by limiting the RFC to simple, routine work that had only occasionally demanding pressures. The Commissioner argues that Marshall's mental status exams with NP Mole were "unremarkable," NP Mole repeatedly noted that Marshall was stable, and the record lacks any evidence of severe panic attacks or that Marshall was unable to leave the house alone. Defendant's Cross-Motion for Summary Judgment [Dkt. 23] ("Def. Mot.") 7-8. But the ALJ did not identify what "significant positive findings" were missing or explain how he arrived at the conclusion that Marshall could tolerate jobs with those stressors even occasionally. The Commissioner's substituted reasoning that Marshall's examinations were unremarkable is irrelevant. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require [the court] to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking.").

I agree with Marshall that the ALJ erred because the ALJ never addressed why she could handle jobs with even occasional high pressures given all of the medical opinions and consistent evidence (at least as of 2016 and more frequently in 2017) that she had trouble controlling her anger and had marked anxiety. The ALJ pointed to no evidence showing that Marshall could tolerate jobs with even occasional high pressure demands given the consistent evidence in the record and the opinions from Kollath and Mole that Marshall would be impaired in her ability to withstand the stress of a normal workday and interact appropriately with others.[5]

_____

[5] These opinions are consistent with Marshall's testimony and evidence in the record of her inability to tolerate stressful social situations. For example, Marshall testified that she walked out

### B.    Treating Nurse Practitioner Elizabeth Mole

As a threshold matter, both sides acknowledge that the ALJ apparently failed to recognize that Mole was not a treating psychiatrist but a Nurse Practitioner.  They do not, however, dispute that an ALJ may discount the opinion of an "other source" such as a nurse practitioner, "if she provides reasons germane to each witness for doing so."  *Popa v. Berryhill*, 872 F.3d 901, 906 (9th Cir. 2017) (citations and quotation marks omitted).  "Such germane reasons may include a finding that the testimony conflicts with the witness's own earlier assessment or with the opinion of other medical specialists, or a finding that the witness was biased."  *Leroux v. Berryhill*, No. 17-cv-00452-SI, 2018 WL 1258206, at *10 (N.D. Cal. Mar. 12, 2018) (citing *Dale v. Colvin*, 823 F.3d 941, 944-945 (9th Cir. May 19, 2016).

Marshall argues that the ALJ erred in discounting Mole's opinions that Marshall would be moderately limited in each area of functioning and her opinions (made in both the 2016 and 2017 Statements) that she would miss more than four days of work each month.  Marshall contends that the moderate limitations, as well as the missing work opinion, are well supported by Mole's treatment notes showing consistent but ineffective treatment of her depression and anxiety, the auditory hallucinations, and her difficulty with memory, many of which became more severe in 2016 and through 2017.

For the same reasons as discussed above, the ALJ erred in assessing Marshall's moderate impairments in functioning with others and handling work stresses, and I need not address them again here.  With respect to Mole's assessment that, in light of all of Marshall's mental health conditions, she would miss more than four days of work each month, the ALJ disregarded that opinion from the 2016 Statement because Mole "identified only sad and depressed mood; flat, blunted affect" but also noted "logical thought processes" which, taken together do "not support her conclusion that claimant would miss a significant amount of work."  AR 26.  The ALJ discounted that same opinion in Mole's 2017 Statement, despite Mole identifying symptoms of

---

of her job when a customer purportedly threatened her life.  AR 42-43.  She believed her managers could no longer handle her moods.  AR 255.  Any "friction" will trigger her PTSD.  AR 46.  She reported to Dr. Kollath that she cannot deal with people and she admitted to overreacting to minor stressors.  AR 409.  Her mother also believes Marshall "cannot be around people."  AR 262.

low energy, depressed mood, poor concentration, auditory hallucinations, flashbacks and nightmares, because Mole's "examination findings were mostly benign, and there is not objective evidence of hallucinations." AR 26-27. The ALJ also noted that because some of the limitations were present before she began treatment with Mole, preceding her alleged onset date, Mole's opinions must be discounted. AR 27.

Marshall argues that the ALJ erred by ignoring Mole's detailed notes that would support the four days of missing work limitations by improperly focusing on "the more normal examination findings out of context and failed to appreciate overall diagnostic picture presented by NP Mole's records." Pl. Mot. 10. I agree. For example, the ALJ's decision to reject NP Mole's opinion that Marshall will "miss a significant amount of work" ignores Mole's repeated statements that Marshall had "minimal" response to the pharmacological treatment, and more specifically, they were ineffective at controlling the symptoms that impacted Marshall's sleep. AR 413 (Marshall had "minimal" response to medications); AR 396 (July 23, 2015), 400 (August 20, 2015), 404 (September 17, 2015); *see also* AR 49 (Marshall testified that her medications "rarely help"); AR 409 (Marshall reported to Kollath that her medications are ineffective); AR 268 (Marshall's mother agreeing with NP Mole's opinion that "[medications] they haven't worked"). In addition, NP Mole's treatment records from 2015 and 2016 show Marshall's symptoms were uncontrolled as she suffered from "mood swings" and increased feelings of anxiety. AR 396, 400 (Mole notes from July 23, 2015, and August 20, 2015, stating, "[m]ood is very anxious"); AR 429, 434 (Mole notes from January 18, 2016, and March 3, 2016 stating, "[a]dmits to . . . . mood swings"); AR 396, 400 (Mole notes from July 23, 2014, and August 20, 2015, stating, "increased anxiety"). During that period, Marshall reported having "crying spells" and increased altercations with her mother and partner. AR 396, 400 (Mole notes from July 23, 2015, and August 20, 2015, stating, "increased episodes of crying spells"); AR 429, 434 (Mole notes from January 18, 2016, and March 3, 2016, stating, "admits to . . . . crying spells"); AR 430 (Mole notes from January 18, 2016, visit stating, Marshall "admit[ted] to increased verbal altercation with [her] mother and her partner").

The Commissioner correctly notes that if Mole's opinions were inconsistent with the

17

medical evidence, that would be a germane reason for rejecting her "other source" opinion. Def.

Mot. 9. However, the ALJ did not identify what specific medical evidence was inconsistent with

Mole's belief that Marshall's symptoms would likely cause her to miss that much work per week.

As reasons for rejecting the July 2017 Statement, the ALJ relied on the assertion that NP

Mole's "examination findings were mostly benign, and there is not objective evidence of

hallucinations." AR 26-27. Additionally, the ALJ relied on Mole's indication that some of

Marshall's "limitations were present before she began treatment, which long precedes her alleged

onset date and the date she quit working." AR 27. Marshall argues, as with the rejection of the

2016 Statement, that the ALJ failed to "appreciate the overall diagnostic picture," Pl. Mot. 10, and

that the ALJ erred in expecting some form of "objective evidence" to substantiate the repeated

complaints of auditory hallucinations. *Id.*

Here, as with the January 2016 Statement, the ALJ erred by labelling NP Mole's

examinations as "mostly benign" without addressing the consistent evidence that Marshall's

anxiety and depression were not responding to medications and continued to cause Marshall

limitations in her ability to interact with her family and others. *See* AR 27; *Thy v. Colvin*, No. 16-

cv-03127-WHO, 2017 WL 4310731, at *18 (N.D. Cal. Sept. 28, 2017) (noting that ALJ's reason

for rejecting a nurse practitioner's opinion as "inadequately supported by clinical findings"

without suggesting why treatment notes were insufficient does not qualify as sufficiently

germane).

The ALJ also erred by relying on the lack of "objective evidence" of hallucinations despite

Marshall's repeated reports to NP Mole and others of the existence of her auditory hallucinations.

AR 551. The Ninth Circuit has held that, given the nature of psychiatry, "[d]iagnoses will always

depend in part on the patient's self-report," and that "the rule allowing an ALJ to reject opinions

based on self-reports does not apply in the same manner to opinions regarding mental illness."

*Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017). Here, notes from Marshall's 2017

Pathways visits support NP Mole's opinion that Marshall suffers from auditory hallucinations.

During her January 30, 2017 visit, Marshall reported ongoing auditory hallucinations and NP

Mole recommended that Marshall increase her Viibryd intake to treat symptoms of anxiety,

18

depression, and auditory hallucinations. AR 506, 508. The May 31, 2017, visit notes taken by NP Fraino record an impression that Marshall "[c]ontinues to have [auditory hallucinations/visual hallucinations]." AR 500. In NP Mole's notes dated July 3, 2017, she wrote that Marshall had "increased [auditory hallucinations]." AR 493, 495. In rejecting NP's Mole's opinion of Marshall's auditory hallucinations, the ALJ never addresses NP Mole and NP Fraino's notes that document Marshall's hallucinations. Unlike check-the-box reports that do not contain explanations for the basis of their conclusions, consistent evidence from the notes of providers at Pathways indicate that Marshall was suffering from auditory hallucination. *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (noting the use of a "check-the-box" form from an other source, without supporting evidence, was a germane reason for discounting the opinion).

Finally, NP Mole's statement that the limitations' existence "long precedes" the alleged onset date and when she quit working is not a sufficiently germane reason for rejecting her opinion. AR 27. Mole said only that unspecified "limitations" were present before Marshall became a patient at Pathways but did not identify the severity of those limitations or when specific limitations began. The ALJ could not rely on this one, unspecific response, to discount NP Mole's opinion. *See Popa v. Berryhill*, 872 F.3d at 906.

### C.     Treating Physician Dr. Romesh Japra

Marshall also argues that the ALJ erred in rejecting treating physician Dr. Japra's opinions regarding her limitations. These included that Marshall's cardiac symptoms worsened under stress and with exertion, that they resulted in interference with her ability to attend and concentrate on work tasks, and that she could stand and walk only for 2 hours a day and sit for only 2 hours a day, would need to change positions at will, and would need to elevate her legs with prolonged sitting. The ALJ rejected these opinions, in particular the need to elevate her legs, as "inconsistent" with the objective evidence as a whole and the lack of remarkable diagnostic or examination findings. AR 25.

Marshall argues that the ALJ did not provide a clear and convincing reason for rejecting Dr. Japra's opinion. She notes that the records show "treatment for edema in Marshall's legs" and the ALJ failed to "appreciate the overall diagnostic picture drawn" by Dr. Japra. Pl. Mot. 11-12.

19

She points out that Dr. Japra's "notes show congestive heart failure, an implanted defibrillator, and episodes of syncope, vertigo, and chest pains." Pl. Mot. 11. The Commissioner responds that Dr. Japra did not make "any significant findings in recent years," and that the ALJ was entitled to rely on the "unremarkable" diagnostic imaging and other studies in rejecting Japra's opinions as to Marshall's limitations. Def. Mot. 10-11.

Marshall does not identify the parts of the record that the ALJ allegedly ignored or improperly discounted in his findings regarding Japra's opinion (which she did regarding Mole's opinions). In particular, she does not identify anywhere in the treatment records of self-reports where anyone suggested that she needed to elevate her legs as frequently as Japra indicated in his Statement. The record, however, does suggest – and the ALJ failed to address – Japra's opinion that Marshall's symptoms (such as her shortness of breath and chest pressure) increased when Marshall was under stress or exerted herself. On remand, the ALJ will need to address these symptoms, which may or may not be interrelated to Marshall's mental health impairments, seeking clarification or additional information from an examining physician as necessary.

## II.    MARSHALL'S SELF-REPORTS AND THIRD-PARTY TESTIMONY

### A.    Marshall's Self-Reports

To determine whether a claimant's testimony is credible, an ALJ must engage in a two-step analysis. *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which would reasonably be expected to provide the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F. 3d 1028, 1035–36 (9th Cir. 2007) (internal quotation marks omitted). "If the claimant satisfies the first step of the analysis, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Garrison*, 759 F.3d at 1014-1015 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. Mar. 29, 1996)). "[T]he ALJ must give 'specific, clear, and convincing reasons for rejecting' the testimony by identifying 'which testimony [t]he ALJ found not credible' and explain 'which evidence contradicted that testimony.'" *Laborin v. Berryhill*, 867 F.3d 1151, 1155 (9th Cir. 2017) (quoting *Brown-Hunter v.*

*Colvin*, 806 F.3d 487, 498, 494 (9th Cir. 2015) (alterations in original)). "The clear and convincing standard is the most demanding required in Social Security cases." *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002).

The ALJ found that Marshall's medically determinable impairments could reasonably cause the alleged symptoms, but her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ." AR 23. He then generally summarized the medical evidence regarding Marshall's physical impairments and mental impairments. AR 23-24. He concluded that Marshall's "allegations regarding the severity of her symptoms and limitations are greater than expected in light of the objective evidence of record." AR 24.

Marshall argues that the ALJ improperly discounted her statements by failing to specify what testimony was not credible and provide specific evidence that contradicts her self-described limitations, which itself requires remand. Pl. Mot. 13. The Commissioner responds that the ALJ provided specific reasons for discounting Marshall's testimony because the ALJ found a lack of objective support for her allegations and inconsistencies in her testimony with the course of treatment evidence. Def. Mot. 13-14. However, the ALJ failed to identify any evidence in the record (for example, evidence of Marshall's daily life activities or notes from her medical providers) that contradicts her testimony regarding the severity of her symptoms and the limitations those symptoms impose.[6] Under Ninth Circuit caselaw, that was error. *See Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015) ("[A]n ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination.").

**B.    Barbara Marshall's Lay Witness Testimony**

"[L]ay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment." *Stout v.*

---

[6] The ALJ, for example, did note that NP Mole's treatment records "do not indicate that the claimant has significant panic attacks or is unable to leave the house alone," AR 24-25, but that comment does not identify what evidence in the record undermines Marshall's testimony about the impact that her mental health symptoms have on her daily functioning.

*Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006) (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996)) (internal quotation marks omitted). "Consequently, if the ALJ wishes to discount the testimony of lay witnesses, [s]he must give reasons that are germane to each witness." *Stout*, 454 F.3d at 1053 (quoting *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)) (internal quotation marks omitted).

After discussing the medical providers' evidence, the ALJ decided that "significant weight cannot be given" to the statement submitted by Marshall's mother. AR 27. In discrediting Barbara's statement, the ALJ questioned the statement's accuracy as she "is not medically trained to make exacting observations" and noted that her statements are inconsistent with "the preponderance of the opinions and observations by medical doctors in this case." *Id.* Marshall argues that this was erroneous because lay witnesses do not need medical expertise and Barbara's statements are "entirely consistent" with the evidence in the record. Pl. Mot. 15. The Commissioner responds that inconsistency with medical evidence is a germane reason for discounting lay witness testimony. Def. Mot. 15.

As with the treatment of Marshall's self-reports, the ALJ erred by failing to identify why specific statements from Barbara were inconsistent with specific pieces of medical evidence in the record. AR 27. The ALJ's failure to identify those alleged inconsistencies with specificity was erroneous. *See Solomon v. Comm'r of Soc. Sec.*, No. 1:17-cv-01763, 2018 WL 6419672, at *10 (E.D. Cal. Dec. 6, 2018) (the ALJ did not provide a sufficiently germane reason for discounting the lay witness's testimony because he failed to identify the lay witness's specific overstatements or portions of the record that demonstrated an overstatement); *Vieira v. Berryhill*, No. 2:15–cv–1685, 2017 WL 931808, at *5 (E.D. Cal. Mar. 9, 2017) (ALJ's "vague and conclusory" assertion that the lay witness testimony was not consistent with a preponderance of the evidences did not constitute a sufficiently germane reason for rejecting the testimony).

Additionally, the ALJ improperly discounted Barbara's statements because "she is not medically trained." AR 27. Barbara offered her opinion as a lay witness, not a medical expert, so her lack of medical training is irrelevant to her ability to observe Marshall's alleged conditions. *See Nourzay v. Berryhill,* No. CV 17–2385, 2018 WL 3019628, at *14 (C.D. Cal. June 13, 2018)

("[A] lay witness's lack of medical training is not a germane reason to discount her testimony."); *Tadevosyan v. Colvin*, No. 2:12–cv–2382, 2014 WL 1302446, at *5 (E.D. Cal. Mar. 31, 2014) (concluding a lay witness's lack of medical training did not provide a sufficient basis for discrediting her testimony because the witness never purported to offer a medical opinion).

**CONCLUSION**

Having concluded that the ALJ made numerous errors in addressing the medical opinion evidence as well as Marshall's and her mother's testimony, I need not reach Marshall's arguments that the ALJ also erred by failing to include the appropriate limitations in Marshall's RFC and in concluding that there were sedentary jobs available that she could perform. However, I will not apply the credit-as-true rule. Instead, I remand this case for further proceedings before the ALJ because I find that "further administrative proceedings would be useful." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014) (internal quotation marks and citations omitted).

Therefore, Marshall's motion is GRANTED, defendant's motion is DENIED, and this case is REMANDED for further proceedings.

**IT IS SO ORDERED.**

Dated: March 31, 2020

William H. Orrick
United States District Judge